## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Susan K. Knutson,

                                        Plaintiff,

                                                          Civ. No. 05-180 (RHK/JSM)
v.                                                        **MEMORANDUM OPINION**
                                                          **AND ORDER**
Medtronic, Inc.,

                                        Defendant.

---

James C. Snyder, Snyder Law Office, P.A., Roseville, Minnesota, for Plaintiff.

Nancy E. Brasel, Greene Espel P.L.L.P., Minneapolis, Minnesota, for Defendant.

---

### INTRODUCTION

Plaintiff Susan Knutson alleges that her former employer, Defendant Medtronic, Inc. ("Medtronic"), unlawfully terminated her employment based upon her disabilities and in retaliation for her complaints regarding alleged discriminatory acts within the company. This matter comes before the Court on Medtronic's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the Court will grant the Motion.

### BACKGROUND

Medtronic is an international medical technology company with headquarters in Minneapolis, Minnesota. (Am. Compl. ¶¶ 1-2.) Knutson was hired by Medtronic in 1995 to work as a Software Quality Engineer ("SQE"). (Knutson Dep. Tr. at 101.) During her

first few years with Medtronic, Knutson worked in several different capacities as a SQE and received commendable reviews as well as several monetary awards.  (Knutson Dep. Tr. at 103-09.)  In September 1999, she was appointed as a Principal SQE[1] for Medtronic's Cardiac Rhythm Management Division.  (Brasel Aff. Exs. 1, 8.)

About the same time, Knutson began experiencing health problems.  In February 1999, she had surgery on her right rotator cuff and was out of the office for the next three months; however, she did receive approval to telework[2] from home during a portion of that time.  (Knutson Dep. Tr. at 155; Brasel Aff. Ex. 6.)  In December 1999, Knutson also experienced neck and arm pain related to vertebrae and disc injuries.  (Brasel Aff. Ex. 6.)  In January 2000, she again received approval to telework from home on a part-time basis due to persistent pain.  (Brasel Aff. Ex. 6.)  Following four months of teleworking from home, she had spinal fusion surgery on May 3, 2000.  (Knutson Dep. Tr. at 154; Brasel Aff. Ex. 6.)  She returned to work in her office on a modified time schedule in June 2000. (Knutson Dep. Tr. at 154, 158; Brasel Aff. Ex. 6.)  In total, Knutson was unable to work

---

[1] A "Principal SQE" "uses professional concepts in developing approaches in the solution of critical problems and broad design issues."  (Brasel Aff. Ex. 1 App. A.) "Significant barriers-to-entry (i.e. top mgmt review approval) exist at this level."  (Id.)

[2] Medtronic's Teleworking Policy defines "teleworking" as "a flexible work arrangement that enables an employee to meet job responsibilities at a location other than the regular office."  (Brasel Aff. Ex. 10.)  Working from home is done pursuant to a "teleworking agreement," which is "a cooperative agreement between an employee and manager," where the "employer may, at any time, change any or all of the conditions for teleworking."  (Id.)  "Employee independence and off-site work require careful planning, communication, and ongoing observation of the effects on teamwork and a collaborative process."  (Id.)

at her office for part or all of 125 days in 2000.  (Brasel Aff. Ex. 7.)  This was reflected in

her yearly performance review dated July 27, 2000[3]:

> [Knutson] needs to do better at meeting her objective and schedule
> commitments.  I realize the past year has been especially difficult, but she
> should not take on responsibilities that she cannot complete, since it leaves
> the team in a bind.
>
> It has obviously been difficult, especially in the past year with [Knutson's]
> medical problems, to know when [she] will be in the office, and when she
> will be able to take on and complete tasks.  It is hard to depend on her when
> we don't know when she will be available, and don't know how much she
> has time to accomplish.

(Brasel Aff. Ex. 8.)  Knutson claims this was the first time she was made aware that her

absenteeism was a problem.  (Knutson Dep. Tr. at 114.)  "It was my understanding, and in

the meeting I expressed this to [my supervisor, Jennifer Oliver], that if you pre-worked

the time or made arrangements to make up the time, you weren't considered absent from

work."  (Knutson Dept. Tr. at 114.)   Medtronic maintains an Absenteeism Policy, which

states:

> Satisfactory performance depends on being on the job.  Excessive
> absenteeism may result in delays or reductions in merit increases and may
> also lead to disciplinary action, including termination.  Excessive
> absenteeism is defined as absences of more than 2% of the available time to
> work in the past 12 months.

(Brasel Aff. Ex. 5.)

---

[3] Knutson was required to read and sign-off on each annual performance review.

In April 2001, Knutson began experiencing pain in her left knee and was again permitted to telework part-time from home.  (Brasel Aff. Ex. 6.)  She teleworked for several months until early July 2001, when she had surgery on her left knee and then returned to work in the office on a part-time basis.  (Brasel Aff. Ex. 6.)  Her absenteeism and flexible schedule were brought up once again in her performance review dated July 22, 2001:

> [Knutson] works a flexible work schedule - along with the benefits of having such flexibility comes the responsibility of letting the rest of the people at work know when you are available to them. [She] needs to figure out a mechanism to give better communication in advance - regarding hours at work, about meeting project or process commitments, giving a heads up if she will miss meetings, giving status to manager.
>
> [Knutson] doesn't regularly attend process meetings or provide review comments. . . . [She] seems to miss many[ SQE] specific and some project related meetings which is problematic since she has valuable input.

(Brasel Aff. Ex. 9.)

In February 2002, Knutson had sinus surgery to repair a deviated septum. (Knutson Dep. Tr. at 147.)  Following this surgery, she teleworked from home for one week.  (Knutson Dep. Tr. at 147-48.)  In March 2002, Knutson had scar tissue removed from her left heel.  (Knutson Dep. Tr. at 159.)  She was again allowed to telework during recovery and a post-surgery staff infection.  (Brasel Aff. Ex. 6.)  In September 2002, Knutson had surgery on her right Achilles heel, followed by several weeks off from work for recovery.  (Knutson Dep. Tr. at 159; Brasel Aff. Ex. 6.)  On October 24, 2002, Knutson was notified by Medtronic that she had exhausted the twelve weeks of leave

4

available under the Family Medical Leave Act ("FMLA"), meaning that any further medical leave would be classified as "non-FMLA medical leave."  (Brasel Aff. Ex. 4.) She was further notified that under Medtronic's Salary Continuation Program, she was "eligible to receive salary continuation for up to 22 weeks (880 hours) provided that it is medically necessary and [her doctor] completed the necessary paperwork."  (Brasel Aff. Ex. 4.)  Knutson requested permission to telework during the remainder of her recovery period, but Oliver denied the request due to a lack of "meaningful work for [her] to do two hours a day at home."  (Brasel Aff. Exs. 12-13.)

Prior to returning to work on November 11, 2002, Knutson requested an electric scooter "to get around" the building.  (Knutson Dep. Tr. at 37.)  She made this request during a conference call, indicating to Oliver and a human resources representative that she was currently using a manual wheelchair but would prefer an electric scooter. (Knutson Dep. Tr. at 38.)  According to Knutson, Oliver denied her request.  (Knutson Dep. Tr. at 38.)  Medtronic anticipated Knutson's use of a wheelchair upon returning to work and made necessary accommodations, including widening the door to her office, rearranging her office furniture, designating a handicapped parking space, and scheduling assistance with meetings.  (Knutson Dep. Tr. at 66; Brasel Aff. Ex. 15.)

From January through November 2002, Knutson worked in the office approximately 29 of 225 workdays.  (Brasel Aff. Ex. 7.)  Once again, this was noted in her annual performance review dated July 23, 2002:

> Since [Knutson] has been working from home, people she interacts with at
> Medtronic have noticed a disconnect between her words and actions.
> Project and Process activities that have been committed to are not
> consistently being met.  As [Knutson's] Functional Manager, I have a
> difficult time identifying exactly what [she] is working on from home
> because of the lack of status reporting, time reporting, and attendance at
> biweekly 1:1 meetings . . . .  Lack of communication from [Knutson] over
> an extended period of time has people questioning what she is working on
> and if she is able to work from home.
>
> [Knutson] has been unpredictable in schedule such that her SQE peers and
> project peers are unsure of her working hours and availability.  Concern has
> been raised to me as [Knutson's] manager numerous times that it is difficult
> communicating with [her] on project work because phone calls and emails
> were not being responded to. [She] has also missed commitments she has
> made to fellow SQEs and project staff regarding deliverables.

(Brasel Aff. Ex. 11.)  The 2002 performance review also contained Oliver's observation

that Knutson's teleworking arrangements were not working.  (Brasel Aff. Ex. 11.)

"Teleworking is a privilege and is available only if it makes business sense."  (Brasel Aff.

Ex. 11.)

      In January 2003, Knutson spoke with Sara Johnson, a human resources

representative, regarding personal concerns and conflicts with Oliver.  (Knutson Dep. Tr.

at 87.)  Knutson discussed her "feelings of being left out of the group . . . [and] being

treated differently than the other people in the department, being threatened and generally

feeling unsafe in a one-on-one situation with [Oliver]."  (Knutson Dep. Tr. at 87.)

Johnson arranged a group meeting with Knutson and Oliver the following week to "talk

about the issues."  (Knutson Dep. Tr. at 88.)  According to Knutson, Oliver was

"receptive at first," but then "everything changed."  (Knutson Dep. Tr. at 88.)  Knutson

claims that Oliver began imposing unreasonable restrictions upon her.  (Knutson Dep. Tr. at 89-90.)  In March 2003, Knutson alleges that Oliver informed her that any future medical appointments would have to be made outside of normal business hours.[4] (Knutson Dep. Tr. at 47.)  She claims that this restriction prohibited her from seeing her pulmonary doctor, her primary care physician, and her asthma doctor.  (Knutson Dep. Tr. at 47.)  Knutson also alleges that Oliver prohibited her from using the bathroom during working hours, which posed a significant problem associated with her diuretic medication.[5]  (Knutson Dep. Tr. at 49.)  However, Knutson did not inform anyone at Medtronic of the bathroom restriction or that it interfered with her medication usage. (Knutson Dep. Tr. at 50-51.)  Knutson also claims that Oliver required her to call Barb Lechner, an administrative assistant at Medtronic, each day when she arrived at the office and left for the day, to keep track of her work schedule.  (Knutson Dep. Tr. at 125.)

On February 20, 2003, Knutson received a memorandum from Oliver ("First Status Memo") regarding her employment status.  (Brasel Aff. Ex. 23.)  The First Status Memo noted that Knutson had "reached a critical juncture in her career with Medtronic"

---

[4] For purposes of the instant Motion, the Court assumes the truth of this claim. Medtronic, however, denies that Oliver ever imposed this restriction, citing an email dated February 14, 2003, where Oliver gave Knutson the option to work a "standard" eight-hour work day or "pick some days early and others late" to accommodate medical appointments.  (Brasel Aff. Ex. 19.)

[5] For purposes of the instant Motion, the Court assumes the truth of this claim. Medtronic, however, denies this allegation, arguing that documents detailing Knutson's restrictions and needed improvements do not document the imposition of a "bathroom ban."  (Reply Mem. at 3.)

due to not being "in alignment with some of Medtronic's Core Competencies nor demonstrat[ing] a level of technical contribution expected of a Principal [SQE]." (Id.) The First Status Memo gave her two options. First, Knutson could opt to be placed on a Performance Improvement Plan ("PIP"), which would require her to meet specific objectives during the following twelve weeks. (Brasel Aff. Ex. 23.) If her performance did not meet objectives stated in the PIP by May 26, 2003, Knutson's employment with Medtronic would be terminated. (Id.) Second, Knutson could opt to be placed on a 90-day career transition plan with an external career counselor to find a "more suitable job." (Id.) If she was unable to find a suitable position by May 26, 2003, her employment with Medtronic would be terminated. (Id.) Ultimately, Knutson chose to stay in her current position as a Principal SQE. Her PIP included the establishment of "regular work hours 9:00 - 5:30 daily with the exception of every 4-6 weeks when one day of the week she will have a doctor's appointment with the foot surgeon . . . . [Knutson] must use vacation time for any [other] time out of the office." (Brasel Aff. Ex. 1.)

In March 2003, Knutson began experiencing severe problems with her asthma. (Knutson Dep. Tr. at 55.) She was required to treat her asthma by using a nebulizer several times a day; she mentioned to Steve Clark, an Employee Assistance Program member, that she felt "self-conscious" using her nebulizer at work and wanted a private area for her treatments. (Knutson Dep. Tr. at 42, 57.) However, conversations with members of the Employee Assistance Program were confidential (i.e. not shared with

management), and Knutson never spoke with anyone else about her interest in finding a

private area to nebulize.  (Id.)

On April 21, 2003, Knutson was sent another employment status memo ("Second

Status Memo") by Oliver, which noted that Knutson's absenteeism rate during the past

six months was 46% (missing 29 of 63 workdays), consisting of both medical and

personal absences.  (Brasel Aff. Ex. 21.)  "Over the past year and a half, [Knutson's]

absences from work have adversely impacted [her] ability to maintain technical

knowledge of the business."  (Id.)  For the second time, Knutson was given two options.

First, she could retain her current position by "regularly be[ing] present at work, with

"any further absences for any reason" resulting in possible termination.  (Brasel Aff. Ex.

21.)  Second, she could choose to receive a severance package of sixteen weeks pay plus

external outplacement services.  (Id.)  Ultimately, Knutson chose to remain at Medtronic.

Shortly after the Second Status Memo, Patty Krantz replaced Oliver as Knutson's

supervisor.  (Krantz Aff. ¶ 1.)  Despite the supervisory change, Knutson continued to

struggle with her work schedule.  Between April 29 and June 23, 2003, she arrived on-

time to work on only 7 of 37 days.  (Brasel Aff. Ex. 7.)  Although she had stopped using a

wheelchair in early 2003, she continued to be medically  restricted to walking

approximately 200 feet at one time.  (Knutson Dep. Tr. at 44.)  In June 2003, she was

assigned to a project located in another building, which required her to walk "well over

200 feet."  (Knutson Dep. Tr. at 45.)  Knutson did not request a change of assignment or

complain, assuming that Medtronic was aware of her restrictions.  (Knutson Dep. Tr. at

45.)  Knutson's Performance Improvement Plan became effective on June 23, 2003, and outlined a number of work objectives and restrictions, including that "teleworking will not be allowed during the hours [Knutson is] scheduled to be in the office."  (Snyder Aff. Ex. 2.)  She was required to "communicate to [Krantz] in advance . . . for occasional medical appointments needed during business hours - it is expected that time out of the office for these appointments will be made up (personal time available to charge to has been exceeded at this time)."  (Id.)

On July 14, 2003, Knutson was hospitalized due to a severe asthma attack and chest pains.  (Knutson Dep. Tr. at 58.)  While in the hospital, she was referred to a cardiologist and diagnosed with a heart condition.  (Knutson Dep. Tr. at 58.)  Knutson alerted Medtronic that she was in the hospital due to an asthma attack and promised to call back with a status report.  (Knutson Dep. Tr. at 62; Brasel Aff. Ex. 27.)  She called again the next morning, stating that she was still in the hospital and had not been given a release date.  (Brasel Aff. Ex. 27.)  Knutson did not return to work or contact Krantz directly during the next six days, which resulted in Krantz's decision to terminate Knutson's employment on July 23, 2003:

> As stated in the mid-year review and upon [Knutson's] return from her last two absences, any future absences from work, other than vacation time that is planned one week in advance, and failure to be in the office during her core work hours of 9:00 a.m. (or earlier as required to attend project meetings) - 6:00 p.m. (except during lunch), without prior authorization from [Krantz], may result in immediate termination.  Medtronic has made reasonable attempts to accommodate [Knutson's] medically related absences. [She] cannot meet the essential requirement of being at work on a regular basis to provide Software Quality Engineering support for product

10

> development and release.  Based on the foregoing, we have made the
> decision to terminate [Knutson's] employment, effective immediately.

(Brasel Aff. Ex. 27.)  Following her termination, Knutson immediately applied for

disability benefits from the Social Security Administration ("SSA").  (Brasel Aff. Ex. 28.)

The SSA made a disability determination and started sending her monthly disability

benefit payments in January 2004.  (Id.)

Knutson filed a charge with the Equal Employment Opportunity Commission

("EEOC"), pursuant to 29 U.S.C. § 626(b), alleging unlawful discrimination and

retaliation.  (Am. Compl. ¶ 5.)  On November 5, 2004, the EEOC issued her a Notice of

Right to Sue.  (Id.)  Knutson also filed a charge of discrimination with the Minnesota

Department of Human Rights ("MDHR").  (Id.)  On December 14, 2004, she received a

Notice of Right to Sue from the MDHR.  (Id.)

On January 28, 2005, Knutson commenced this action against Medtronic alleging

three claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-

12163, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.01-

363A.41: (1) disability discrimination or disparate treatment due to disabilities, (2) failure

to accommodate, and (3) retaliation.  (Am. Compl. ¶¶ 24-42.)  Medtronic now moves for

summary judgment.

## STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). For purposes of summary judgment, a fact is "material" if its resolution will determine the outcome of the case, and an issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp, 475 U.S. 574, 586-87 (1986).  Upon a motion for summary judgment, the moving party carries the burden of showing there is no genuine issue of material fact, and all evidence and reasonable inferences must be viewed in a light most favorable to the non-moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## ANALYSIS

Knutson alleges claims for disparate treatment due to her disabilities, failure to accommodate, and retaliation in violation of both the ADA and the MHRA.  The Court will address each issue in turn.

### A.     Disparate treatment

Knutson alleges that Medtronic "discriminated against [her] based on her disabilities" by "failing to accommodate her disabilities, instruction that she could not be absent from work for any reason, including for treatment of her disabilities, placing her on Performance Improvement Plans, and termination of her employment."  (Am. Compl. ¶ 10.)  According to Knutson, her alleged disabilities include "asthma, heart problems,

12

and foot problems," which manifest themselves in limitations such as "difficulty breathing, difficulty walking," using "a nebulizer every four to six hours in order to breathe, see[ing] a doctor regularly, and tak[ing] medication daily." (Am. Compl. ¶¶ 7, 12.) Based upon her termination by Medtronic, Knutson claims she suffered "emotional distress . . . loss of self-esteem, sleeplessness, anxiety, depression, fatigue, and headaches." (Am. Compl. ¶ 23.)

Under the ADA, employers are prohibited from discriminating against " a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). Discrimination claims are subject to the McDonnell-Douglas burden shifting test.[6]  Wilking v. County of Ramsey, 153 F.3d 869, 872 (8th Cir. 1998). Under the McDonnell-Douglas framework, Knutson must first establish a prima facie case of disability discrimination. See Wilking, 153 F.3d at 872. If she does, the burden shifts to Medtronic to articulate a legitimate, non-discriminatory reason for its actions. Id. at 872-73. If Medtronic articulates such a reason, the burden shifts back to Knutson to demonstrate that the stated reason is pretext for disability discrimination. Id. at 873. At all times, Knutson bears the ultimate burden of

---

[6] Claims under the MHRA are subject to the same standards as ADA claims. Somers v. City of Minneapolis, 245 F.3d 782, 788 (8th Cir. 2001).

demonstrating that disability discrimination was the real reason for Medtronic's actions. See Snow v. Ridgeview Med. Ctr., 128 F.3d 1201, 1206 (8th Cir. 1997).

### 1.    Prima facie case

To establish a prima facie case of disability discrimination, Knutson must show that: (1) she was disabled within the meaning of the ADA, (2) she was qualified to perform the essential functions of her job, with or without reasonable accommodations, and (3) she suffered an adverse employment action because of her disability.  See Wilking, 153 F.3d at 872.  Summary judgment is appropriate if Knutson fails to establish any one of these three elements.  Wilking, 153 F.3d at 873.

Medtronic argues that "Knutson cannot establish a prima facie case of discrimination . . . because she cannot establish that she is a qualified individual with a disability."  (Mem. in Supp. at 22.)  "Knutson is not qualified to perform the essential functions of her job because she cannot meet even the liberal attendance requirements Medtronic had in place during her tenure."  (Mem. in Supp. at 23.)  Medtronic relies principally upon Greer v. Emerson Elec. Co., 185 F.3d 917, 921-22 (8th Cir. 1999), arguing that "an employee who is unable to come to work on a regular basis is unable to satisfy any of the functions of the job . . . ."  (Mem. in Supp. at 23.)  Medtronic also argues that "Knutson's receipt of [disability benefits from the SSA] buttresses Medtronic's position that Knutson is not a qualified individual with a disability" because the SSA defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

14

expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  (Mem. in Supp. at 23-24, citing 42 U.S.C.

§ 423(d)(1)(A).)  Medtronic cites Lane v. BFI Waste Sys., 257 F.3d 766, 769 (8th Cir.

2001), arguing that "well-settled law requires that [Knutson] offer a sufficient explanation

of [the] apparent inconsistency between [her SSA and ADA/MHRA discrimination

claims]" and she "can proffer no evidence to explain it."  (Mem. in Supp. at 24.)

Knutson counters that she was "qualified" within the meaning of the ADA for her

position as a Principal SQE at Medtronic.  (Mem. in Opp'n at 8.)  First, she argues that

she had the necessary education, "background, and experience in computer

programming" to make her a "very qualified person at her job."  (Mem. in Opp'n at 9.)

Second, she contends that she was able to "fulfill the essential functions of her job"

whether working at the office or teleworking at home.  (Mem. in Opp'n at 9.)  According

to Knutson, any issues "revolved around mobility not capability."  (Mem. in Opp'n at. 9.)

The Court concludes that Knutson cannot establish she was "qualified," within the

meaning of the ADA, for her position at the time she was terminated.  The Eighth Circuit

has recognized that "regular and reliable attendance is a necessary element of most jobs."

Greer, 185 F.3d at 921.  In Greer, the district court granted summary judgment for an

employer who terminated the plaintiff due to excessive absenteeism.  Id. at 920.  The

Eighth Circuit affirmed, noting that the defendant "maintained a policy and progressive

discipline practice regarding absenteeism," and the plaintiff "does not dispute the

accuracy of her attendance records or disciplinary forms . . . relied upon in discharging

her." Id. at 922. Like the defendant in Greer, Medtronic maintained and enforced an

Absenteeism Policy, which defined "excessive absenteeism as absences of more than 2%

of the available time to work in the past 12 months." (Brasel Aff. Ex. 5.) Especially

applicable to the role of a SQE, Medtronic contends that an "essential requirement of [the

position is] being at work on a regular basis to provide Software Quality Engineering

support for product development and release." (Brasel Aff. Ex. 27.) Because many of

her absences were medically-related, Medtronic attempted to accommodate her situation

by allowing Knutson to telework from home on several occasions during 1999-2002,

sometimes for weeks or months at a time. (Brasel Aff. Ex. 6.) However, her performance

reviews for 2000-2002 reflected that she was not adequately performing all of the

essential functions of her job from home. (Brasel Aff. Exs. 8, 9, 11.) Therefore, Knutson

was required to work in the office beginning in October 2002, and her absenteeism rate

during the following six months was 46%, which amount to Knutson missing 29 of 63

days for both medical and non-medical reasons.[7] (Brasel Aff. Ex. 6.) Several days before

her termination, Knutson missed a critical deadline for one of her projects, forcing

cancellation of an important meeting and delaying finalization of the project. (Brasel Aff.

Ex. 27.) This was the last straw for Krantz, who observed that Knutson's work group was

---

[7] According to Medtronic's records, Knutson's absences during October 2002 through April 2003 included time off for: doctors' appointments for Achilles tendon, cat died, bloody nose, outpatient treatment for infection of the eye, car problems, dental appointments, ear infections, itchy rash, and other medical appointments. (Brasel Aff. Ex. 21.)

"not staffed at a level that allows SQEs to cover each other's projects on short notice on an ongoing basis; [Knutson's] absences place a burden on the other SQEs and impact the projects to which she is assigned." (Brasel Aff. Ex. 21.) Therefore, Knutson was no longer "qualified" to hold her position due to excessive absenteeism. See Greer, 185 F.3d at 921-22.

Furthermore, Knutson has failed to present evidence regarding the inconsistency between her disability discrimination claim and statements made to the SSA in support of her disability benefit application. "Where an employee has sworn in an application for disability benefits that he [or she] is unable to work at any job, he [or she] must proffer a sufficient explanation to warrant a reasonable juror concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of his [or her] job, with or without reasonable accommodation." Lane, 257 F.3d at 769 (citing Cleveland v. Policy Mgmt. Sys., 526 U.S. 795, 807 (1999)). In this case, Knutson submitted an application to the SSA, and the SSA determined based on her application that she "became disabled under [its] rules on July 23, 2003." (Brasel Aff. Ex. 28.) This means that Knutson was unable "to engage in any substantial gainful activity" at that time. See 42 U.S.C. § 423 (d)(1)(A). She does not dispute that she made this admission in seeking disability benefits. Accordingly, Knutson has failed to present a prima facie case of disparate treatment due to her disabilities because she cannot establish that she was a "qualified" individual within the meaning of the ADA at the time she was terminated by Medtronic.

17

**2.      Non-Discriminatory Reason for Termination and Pretext**

Even if Knutson was able to establish a prima facie case of disability

discrimination, Medtronic had a legitimate and non-discriminatory reason for terminating

her employment.  Excessive absenteeism is a legitimate and non-discriminatory reason

for adverse employment action, even where the absences are health-related.  Pickens v.

Soo Line R.R. Co., 264 F.3d 773, 775-76 (8th Cir. 2001) (absences due to back injury);

Buckles v. First Data Res., Inc., 176 F.3d 1098, 1099 (8th Cir. 1999) (absences due to

sinusitis); Lindgren v. Harmon Glass Co., 489 N.W.2d 804,808 (Minn. Ct. App. 1992)

(absences due to surgery and doctor visits).  In this case, Medtronic's Absenteeism Policy

defines excessive absenteeism as "absences of more than 2% of the available time to

work in the past 12 months."  (Brasel Aff. Ex. 5.)  Notwithstanding Knutson's time off

from work during 2000, 2001, and early 2002 for medical issues, her absenteeism rate

during her final six months of employment was 46% due to medical and non-medical

reasons.  (Brasel Aff. Ex. 21.)  This gave Medtronic, who had been struggling to deal

with Knutson's absences for several years, a legitimate and non-discriminatory reason to

terminate her employment.

Based upon Medtronic establishing a legitimate and non-discriminatory reason for

Knutson's termination, the burden shifts back to her to present evidence that the stated

reason for termination was merely pretext for disability discrimination.  See Wilking, 153

F.3d at 873.  Knutson has failed to present any evidence indicating that she was

terminated due to her alleged disabilities.  The facts of this case compel the opposite

conclusion—the evidence shows that Medtronic spent years attempting to accommodate

Knutson's health problems.  Over the course of four years, Medtronic allowed Knutson to

take periods of weeks or months to cope with several health issues and surgeries while

still paying 70% to 100% of her salary.  (Brasel Aff. Exs. 3, 12-14.)  Medtronic gave her

permission to telework on a number of occasions, even following some questionable

comments from co-workers in yearly performance reviews regarding Knutson's ability to

work from home.  (Brasel Aff. Exs. 6, 8-9.)  In 2003, Medtronic presented Knutson with

two "last chance agreements" (First and Second Status Memos), giving her the choice

between improvement plans or severance packages, in a final attempt to make things

work.  (Brasel Aff. Exs. 21, 23.)  Finally, after Knutson failed to report into work for

more than one week after being hospitalized, Medtronic terminated her employment.

(Brasel Aff. Ex. 27.)  The company could no longer function with a Principal SQE whose

absences negatively "impact[ed] the projects" of an understaffed department.  (Brasel Aff.

Ex. 27.)  This evidence reveals a company forced to make a termination based on

business needs, not discrimination based on alleged disabilities.  Accordingly, summary

judgment should be granted on Knutson's disability discrimination claim.

**B.**     **Failure to Accommodate**

Next, Knutson asserts claims for failure to accommodate under the ADA and the

MHRA.  Specifically, Knutson cites four ways in which Medtronic failed to

accommodate her disabilities.  She argues that: (1) Medtronic should have continued to

allow her to telework from home in late 2002 and 2003 while she was dealing with

various unrelated medical problems; (2) Medtronic should have provided her an electric

scooter upon returning to work after surgery in 2002; (3) Medtronic should have provided

her a private place to use her nebulizer, a treatment required to combat her asthma, but

Medtronic never provided her with a private area; and (4) Medtronic did not follow her

medical restriction, which prohibited her from walking more than 200 feet at a time due

to foot problems, when she was assigned to a project in a different building than her

office.  (Knutson Dep. Tr. at 34-35, 42-43.)  Knutson contends that she "could have been

reasonably accommodated but for [Medtronic's] lack of good faith."  (Am. Compl. ¶¶ 16,

19.)  According to Knutson, Medtronic "failed to take part in an interactive dialogue and

failed to provide documentation of an interactive process," including a failure "to do an

analysis of [her] particular job."  (Am. Compl. ¶ 20.)  She claims that Medtronic "has the

resources to grant an employee such as [herself] reasonable accommodation without

incurring an unacceptable financial hardship."  (Am. Compl. ¶ 20.)

Under the ADA, an employer is required to provide reasonable accommodations to

the known physical or mental limitations of an otherwise qualified employee with a

disability, unless the requisite accommodation would impose an undue hardship on the

employer's business.  42 U.S.C. § 12112(b)(5)(A).  Reasonable accommodation claims

are different from disparate treatment claims, requiring the application of a "modified

burden-shifting analysis."  Fenney v. Dakota, Minnesota & E. R. R. Co., 327 F.3d 707,

712 (8th Cir. 2003).  Unlike disparate treatment claims, which require the use of the

McDonnell-Douglas burden-shifting analysis to "flesh[] out th[e] elusive factual question

of intentional discrimination," failure to accommodate claims do "not turn on the employer's intent or actual motive."  Peebles v. Potter, 354 F.3d 761, 766 (8th Cir. 2004). Instead, "the discrimination [underlying a failure to accommodate claim] is framed in terms of the failure to fulfill an affirmative duty — the failure to reasonably accommodate the disabled individual's limitations."  Id. at 767.  "The known disability triggers the duty to reasonably accommodate and, if the employer fails to fulfill that duty, [the court] does not care if [the employer] was motivated by the disability."  Id.

To establish a claim for failure to accommodate under the ADA and MHRA, Knutson must demonstrate that (1) Medtronic knew of her disabilities[8], (2) she requested accommodations or assistance, (3) Medtronic did not in good faith assist her in seeking such accommodations, and (4) she could have been reasonably accommodated but for Medtronic's lack of good faith.  Battle v. United Parcel Serv., Inc., 438 F.3d 856, 862-63 (8th Cir. 2006) (citing Ballard v. Rubin, 284 F.3d 957, 960 (8th Cir. 2002)); Burchett v. Target Corp., 340 F.3d 510, 517 (8th Cir. 2003) (ADA and MHRA claims).  Where the employee requests accommodation, the employer must engage in an "informal, interactive process" with the employee to identify the limitations caused by the disability and the

---

[8] Medtronic does not dispute the existence of Knutson's disabilities or its knowledge of those disabilities —which are listed in the Amended Complaint as "asthma, heart problems, and foot problems"—but does dispute the substance of her failure to accommodate claim.  (See Mem. in Supp. at 17-20.)  Therefore, the Court assumes that Knutson was disabled within the meaning of the ADA and MHRA.

potential reasonable accommodations to overcome those limitations.  Battle, 438 F.3d at

862 (citing Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 951 (8th Cir. 1999)).

    In seeking summary judgment on Knutson's failure to accommodate claim,

Medtronic argues that her claim is meritless.[9]  The Court agrees.  First, with regard to

Knutson's teleworking request, Medtronic made a good faith effort to accommodate her

by allowing her to telework from home on several occasions in 2000, 2001, and 2002.

(Brasel Aff. Ex. 6.)  But by mid-2002, management determined that Knutson's

teleworking from home had been "unsuccessful."  (Brasel Aff. Ex. 21.)  Oliver noted that

"co-workers and customers [have] complained that it was difficult to contact" her and she

"failed to return phone messages and emails in a timely manner."  (Brasel Aff. Ex. 21.)

Co-workers made negative statements regarding Knutson's teleworking arrangement in

her performance reviews for 2000, 2001, and 2002.  (Brasel Aff. Exs. 8-9, 11.)  Given her

lack of dependability and consistent work performance, Knutson was no longer permitted

to telework in late 2002 because it was not a reasonable accommodation.  (Krantz Aff. ¶

5.)

    Second, Medtronic's failure to provide Knutson with an electric scooter does not

constitute a viable claim.[10]  Knutson was required to use a wheelchair following surgery

---

[9] Knutson's Memorandum Opposing Summary Judgment does not rebut
Medtronic's arguments or even address her failure to accommodate claim.

[10] Medtronic asserts that Knutson's supervisor has no recollection of her request
for an electric scooter, and there is nothing in Knutson's file about the request.  (Krantz
Aff. ¶ 6.)  However, for the purposes of summary judgment, the Court assumes that

on her Achilles tendon in September 2002.  (Knutson Dep. Tr. at 43-44.)  In anticipating

her return to work, Medtronic made necessary accommodations, including widening the

door to her office, rearranging her office furniture, designating a handicapped parking

space, and scheduling assistance with meetings.  (Knutson Dep. Tr. at 66; Brasel Aff. Ex.

15.)  Knutson acknowledges that she requested an electric scooter due to difficulty using

a manual wheelchair, and that a mechanical wheelchair would have resolved any issues.

(Knutson Dep. Tr. at 40-41.)  According to Krantz, Knutson would have been allowed a

mechanical wheelchair if she had requested it.  (Krantz Aff. ¶ 6.)  Therefore, Knutson's

electric scooter complaint lacks merit.

Third, regarding a private place to use her nebulizer, the evidence shows that

Knutson never actually requested these accommodations, which is fatal to her claim.  See

Battle, 438 F.3d at 862 (employee must request accommodations or assistance).  Knutson

discussed her interest in finding a private place to use her nebulizer with Steve Clark, her

representative in the Employee Assistance Program.  (Knutson Dep. Tr. at 42.)  However,

such discussions are confidential, a fact acknowledged by Knutson.  (Krantz Aff. ¶ 8;

Knutson Dep. Tr. at 57.)  Therefore, management at Medtronic was never made aware of

Knutson's request and could not make a good faith effort to offer a reasonable

accommodation.

---

Knutson made such a request.

23

Finally, Knutson did not request an accommodation or complain about her assignment to a project in another building in June 2003. (Knutson Dep. Tr. at 45.) She "assumed" that Medtronic knew of her ambulatory restriction because it was in her medical files. (Knutson Dep. Tr. at 45.) In fact, Krantz was not aware of the ambulatory restriction because she did not have access to Knutson's medical files. (Krantz Aff. ¶ 8.) Therefore, Knutson's complaints regarding a private place to nebulize and walking to another building for a project are not viable.

Because the underlying facts do not form the basis for a valid failure to accommodate claim, summary judgment will be granted.

## C.     Retaliation

Knutson also alleges retaliation claims pursuant to the ADA and the MHRA. Specifically, Knutson claims that she experienced "[r]etaliation for going to HR about some concerns with [Oliver, her supervisor]." (Knutson Dep. Tr. at 87.) In January 2003, Knutson spoke with Sara Johnson, a human resources representative, regarding personal concerns and conflicts with Oliver. (Knutson Dep. Tr. at 87.) Knutson discussed her "feelings of being left out of the group . . . [and] being treated differently than the other people in the department, being threatened and generally feeling unsafe in a one-on-one situation with [Oliver]." (Knutson Dep. Tr. at 87.) Johnson arranged a group meeting with Knutson and Oliver the following week to "talk about the issues." (Knutson Dep. Tr. at 88.) Following this discussion, Knutson claims that she was treated "adversely, including but not limited to, placing her on a Performance Improvement Plan

24

and terminating her employment." (Am. Compl. ¶ 22.) She argues that "the timing of [her] report and [Medtronic's] adverse actions show that the adverse actions were causally connected to [her] protected activities." (Am. Compl. ¶ 22.)

The ADA prohibits retaliation against any individual who has opposed an unlawful act of discrimination, made a charge of discrimination, or participated in any manner in an investigation or proceeding under the ADA. 42 U.S.C. § 12203(a). "To establish a prima facie case of retaliation and survive summary judgment, a plaintiff must demonstrate (1) that he [or she] engaged in statutorily protected activity, (2) that an adverse action was taken against him [or her], and (3) a causal connection between the adverse action and the protected activity." Mershon v. St. Louis Univ., 442 F.3d 1069, 1074 (8th Cir. 2006) (citation omitted). "If this prima facie showing is made, the burden shifts to the defendant to proffer a legitimate nondiscriminatory reason for the adverse action." Id. If the defendant establishes a sufficient reason, "the burden of production then shifts back to the plaintiff to show that the defendant's reason is pretext for discrimination." Id.

In seeking summary judgment on Knutson's retaliation claim, Medtronic asserts that "there is absolutely no causal connection between the conversation and Knutson's termination." (Mem. in Supp. at 28.) The Court agrees. Six months elapsed between Knutson's complaints regarding Oliver in January 2003 and her termination in July 2003. While timing may, under some circumstances, be enough to establish a viable claim for retaliation, six months is far too long to establish a temporal connection. Kipp v. Mo.

Highway Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) (interval of two months

between complaint and termination is too diluted to create the necessary temporal

proximity for a causal connection in a retaliation claim); Gagnon v. Sprint Corp., 284

F.3d 839, 851-52 (8th Cir. 2002) (a one month lapse between an EEOC claim and adverse

employment action is not enough to show a connection); Gonzalez v. City of

Minneapolis, 267 F. Supp. 2d 1004, 1012 (D. Minn. 2003) (interval of four months does

not establish causal connection).

Knutson has no other evidence establishing causation.  Her complaints to Johnson

concerned alleged harassment and negative treatment by Oliver, but Krantz made the

decision to terminate Knutson in July 2003—neither Johnson nor Oliver were involved in

the decision.  (Knutson Dep. Tr. at 87; Brasel Aff. Ex. 27.)  Krantz was not even aware

that Knutson complained of unfair or negative treatment in January 2003.  (Krantz Aff. ¶

10.)  Therefore, Knutson cannot establish a causal connection between complaints made

in January 2003 and her termination, and summary judgment is appropriate.

## CONCLUSION

Based on the foregoing, and all of the files, records and proceedings herein, it is

**ORDERED** that Medtronic's Motion for Summary Judgment (Doc. No. 47) is

**GRANTED**, and the Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:   July 3   , 2006                        s/Richard H. Kyle
                                         RICHARD H. KYLE
                                         United States District Judge

26